PART II
SUPPLYTIME 2005 Time Charter Party for Offshore Service Vessels          EXHIBIT A

1  **Definitions**
2  **"Owners"** shall mean the party stated in Box 2
3  **"Charterers"** shall mean the party stated in Box 3
4  **"Vessel"** shall mean the vessel named in Box 4 and
5  with particulars stated in ANNEX "A"
6  **"Well"** shall mean the time required to drill, test,
7  complete and/or abandon a single borehole including
8  any side-track thereof.
9  **"Offshore Unit"** shall mean any vessel, offshore
10 installation, structure and/or mobile unit used in offshore
11 exploration, construction, pipe-laying or repair,
12 exploitation or production.
13 **"Employees"** shall mean employees, directors,
14 officers, servants, agents or invitees.

"Tow" shall mean the Vessel or object specified in Box 17 to be

towed by the Vessel.

15 **1. Charter Period**
16 (a) The Owners let and the Charterers hire the Vessel
17 for the period as stated in Box 9 from the time the Vessel
18 is delivered to the Charterers.

19 (b) Subject to Clause 12(b), the Charterers have the
20 option to extend the Charter Period in direct continuation
21 for the period stated in Box 10(i), but such an option
22 must be declared in accordance with Box 10(ii).

23 ~~(c) The Charter Period shall automatically be~~
24 ~~extended for the time required to complete the voyage~~
25 ~~or well (whichever is stated in Box 11(i)) in progress,~~
26 ~~such time not to exceed the period stated in Box 11(ii).~~

27 **2. Delivery and Redelivery**
28 (a) Delivery. - Subject to Clause 2(b) the Vessel shall
29 be delivered by the Owners free of cargo and with clean
30 tanks at ~~any time between~~ at the time and the date stated
31 in Box 5, ~~and~~
   ~~the date stated in Box 6~~ at the port or place stated in
32 Box 7 where the Vessel can safely lie always afloat.

33 ~~(b) Mobilisation. –~~
34 ~~(i) The Charterers shall pay a lump sum mobilisation~~
35 ~~charge as stated in Box 12 without discount.~~
36 ~~(ii) Should the Owners agree to the Vessel loading~~
37 ~~and transporting cargo and/or undertaking any~~
38 ~~other service for the Charterers en route to the~~
39 ~~port of delivery or from the port of redelivery, then~~
40 ~~all terms and conditions of this Charter Party shall~~
41 ~~apply to such loading and transporting and/or~~
42 ~~other service exactly as if performed during the~~
43 ~~Charter Period excepting only that any lump sum~~
44 ~~freight agreed in respect thereof shall be payable~~
45 ~~and earned on shipment or commencement of~~
46 ~~the service as the case may be, the Vessel and/~~
47 ~~or goods lost or not lost.~~

48 (c) Cancelling. - If the Vessel is not delivered by
49 midnight local time on the cancelling date stated in Box
50 6, the Charterers shall be entitled to cancel this Charter
51 Party. However, if the Owners will be unable to deliver
52 the Vessel by the cancelling date, they may give notice
53 in writing to the Charterers at any time prior to the delivery
54 date as stated in Box 5 and shall state in such notice the

55 date by which they will be able to deliver the Vessel. The
56 Charterers may within 24 hours of receipt of such notice
57 give notice in writing to the Owners cancelling this Charter
58 Party. If the Charterers do not give such notice, then the
59 later date specified in the Owners' notice shall be
60 substituted for the cancelling date for all the purposes of
61 this Charter Party. In the event the Charterers cancel
62 the Charter Party, it shall terminate on terms that neither
63 party shall be liable to the other for any losses incurred
64 by reason of the non-delivery of the Vessel or the
65 cancellation of the Charter Party.

66 (d) Redelivery. - The Vessel shall be redelivered on
67 the expiration or earlier termination of this Charter Party
68 free of cargo and with clean tanks at the port or place
69 as stated in Box 8(i) or such other port or place as may
70 be mutually agreed. The Charterers shall give not less
71 than the number of days notice in writing of their intention
72 to redeliver the Vessel, as stated in Box 8(ii).

73 ~~(e) Demobilisation. - The Charterers shall pay a lump~~
74 ~~sum demobilisation charge without discount in the amount~~
75 ~~as stated in Box 15 which amount shall be paid on the~~
76 ~~expiration or on earlier termination of this Charter Party.~~

77 **3. Condition of Vessel**
78 (a) The Owners undertake that at the date of delivery
79 under this Charter Party the Vessel shall be of the
80 description and Class as specified in ANNEX "A",
81 attached hereto, and in a thoroughly efficient state of
82 hull and machinery.

83 (b) The Owners shall exercise due diligence to
84 maintain the Vessel in such Class and in every way fit
85 for the service stated in Clause 6 throughout the period
86 of this Charter Party.

87 **4. Structural Alterations and Additional Equipment**
88 The Charterers shall, at their expense, have the option
89 of making structural alterations to the Vessel or installing
90 additional equipment with the written consent of the
91 Owners, which shall not be unreasonably withheld.
92 Unless otherwise agreed, the Vessel is to be redelivered
93 reinstated, at the Charterers' expense, to her original
94 condition. The Vessel is to remain on hire during any
95 period of these alterations or reinstatement. The
96 Charterers shall at all times be responsible for repair
97 and maintenance of any such alteration or additional
98 equipment. However, the Owners may, upon giving
99 notice, undertake any such repair and maintenance at
100 the Charterers' expense, when necessary for the safe
101 and efficient performance of the Vessel.

102 **5. Survey**
103 The Owners and the Charterers shall jointly appoint an
104 independent surveyor for the purpose of determining
105 and agreeing in writing, the condition of the Vessel, any
106 anchor handling and towing equipment specified in
107 ANNEX "A", and the quality and quantity of fuel,
108 lubricants and water at the time of delivery and redelivery
109 hereunder. The Owners and the Charterers shall jointly
110 share the time and expense of such surveys. Charterers

have the option to accept Tug's provided Fuel & Lube

soundings as Fuel and Lube evidence in lieu of Surveys.

Copyright © 2005 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this BIMCO SmartCon document will constitute an infringement of BIMCO's copyright. First published 1975. Revised 1989 and 2005. Adopted by the International Support Vessel Owners' Association (ISOA), London.
Explanatory notes are available from BIMCO at www.bimco.org.

## PART II
### SUPPLYTIME 2005 Time Charter Party for Offshore Service Vessels

111  **6. Employment and Area of Operation**
112  **(a)** The Vessel shall be employed in offshore activities
113  which are lawful in accordance with the law of the place
114  of the Vessel's flag and/or registration and of the place
115  of operation. Such activities shall be restricted to the
116  service(s) as stated in Box 17, and to voyages between
117  any good and safe port or place and any place or
118  offshore unit where the Vessel can safely lie always
119  afloat within the Area of Operation as stated in Box 16
120  which shall always be within International Navigation
121  Limits and which shall in no circumstances be exceeded
122  without prior agreement and adjustment of the Hire and
123  in accordance with such other terms as appropriate to
124  be agreed; provided always that the Charterers do not
125  warrant the safety of any such port or place or offshore
126  unit but shall exercise due diligence in issuing their
127  orders to the Vessel as if the Vessel were their own
128  property and having regard to her capabilities and the
129  nature of her employment.
130  Unless otherwise stated in Box 18(i), the Charterers
131  shall not have the right to use the Vessel for ROV
132  operations. Unless otherwise stated in Box 18(ii), the
133  Vessel shall not be employed as a diving platform.

134  **(b)** Relevant permission and licences from responsible
135  authorities for the Vessel to enter, work in and leave
136  the Area of Operation shall be obtained by the
137  Charterers and the Owners shall assist, if necessary,
138  in every way possible to secure such permission and
139  licences.

140  **(c)** The Vessel's Space. - The whole reach and burden
141  and decks of the Vessel shall throughout the Charter
142  Period be at the Charterers' disposal reserving proper
143  and sufficient space for the Vessel's Master, Officers,
144  Crew, tackle, apparel, furniture, provisions and stores.
145  The Charterers shall be entitled to carry, so far as space
146  is available and for their purposes in connection with
147  their operations:

148  (i) Persons other than crew members, other than fare
149  paying, and for such purposes to make use of
150  the Vessel's available accommodation not being
151  used on the voyage by the Vessel's Crew. The
152  Owners shall provide suitable provisions and
153  requisites for such persons for which the
154  Charterers shall pay at the rate as stated in Box
155  27 per meal and at the rate as stated in Box 28
156  per day for the provision of bedding and services
157  for persons using berth accommodation.

158  (ii) Lawful cargo whether carried on or under deck.

159  (iii) Explosives and dangerous cargo whether in bulk
160  or packaged, provided proper notification has
161  been given and such cargo is marked and packed
162  in accordance with the national regulations of the
163  Vessel and/or the International Maritime Danger-
164  ous Goods Code and/or other pertinent regula-
165  tions. Failing such proper notification, marking or
166  packing the Charterers shall indemnify the Own-
167  ers in respect of any loss, damage or liability
168  whatsoever and howsoever arising therefrom. The
169  Charterers accept responsibility for any additional
170  expenses (including reinstatement expenses) in-
171  curred by the Owners in relation to the carriage
172  of explosives and dangerous cargo.

173  (iv) Hazardous or noxious substances, subject to
174  Clause 14(f), proper notification and any pertinent
175  regulations.

176  ~~(d) Laying-up of Vessel. The Charterers shall have~~
177  ~~the option of laying up the Vessel at an agreed safe~~
178  ~~port or place for all or any portion of the Charter Period~~
179  ~~in which case the Hire hereunder shall continue to be~~
180  ~~paid but, if the period of such lay-up exceeds 30~~
181  ~~consecutive days, there shall be credited against such~~
182  ~~Hire the amount which the Owners shall reasonably~~
183  ~~have saved by way of reduction in expenses and~~
184  ~~overheads as a result of the lay-up of the Vessel.~~

185  **7. Master and Crew**
186  **(a)** (i) The Master shall carry out his duties promptly
187  and the Vessel shall render all reasonable
188  services within her capabilities by day and by night
189  and at such times and on such schedules as the
190  Charterers may reasonably require without any
191  obligations of the Charterers to pay to the Owners
192  or the Master, Officers or the Crew of the Vessel
193  any excess or overtime payments. The Charterers
194  shall furnish the Master with all instructions and
195  sailing directions and the Master and Engineer
196  shall keep full and correct logs accessible to the
197  Charterers or their agents.

198  ~~(ii)(1) No Bills of Lading shall be issued for~~
199  ~~shipments under this Charter Party.~~

200  (2) The Master shall sign cargo documents as
201  directed by the Charterers in the form of receipts
202  that are non-negotiable documents and which are
203  clearly marked as such.

204  (3) The Charterers shall indemnify the Owners
205  against all liabilities that may arise from the signing
206  of such cargo documents in accordance with the
207  directions of the Charterers to the extent that the
208  terms of such cargo documents impose more
209  onerous liabilities than those assumed by the
210  Owners under the terms of this Charter Party.

211  **(b)** The Vessel's Crew if required by Charterers will
212  connect and disconnect electric cables, fuel, water and
213  pneumatic hoses when placed on board the Vessel in
214  port as well as alongside the offshore units; will operate
215  the machinery on board the Vessel for loading and
216  unloading cargoes; and will hook and unhook cargo on
217  board the Vessel when loading or discharging alongside
218  offshore units. If the port regulations or the seamen and/
219  or labour unions do not permit the Crew of the Vessel to
220  carry out any of this work, then the Charterers shall make,
221  at their own expense, whatever other arrangements may
222  be necessary, always under the direction of the Master.

223  **(c)** If the Charterers have reason to be dissatisfied
224  with the conduct of the Master or any Officer or member
225  of the Crew, the Owners on receiving particulars of the
226  complaint shall promptly investigate the matter and if
227  the complaint proves to be well founded, the Owners
228  shall as soon as reasonably possible make appropriate
229  changes in the appointment.

230  **(d)** The entire operation, navigation, and management
231  of the Vessel shall be in the exclusive control and
232  command of the Owners, their Master, Officers and
233  Crew. The Vessel will be operated and the services

Copyright © 2005 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this BIMCO SmartCon document will constitute an infringement of BIMCO's copyright. First published 1975. Revised 1989 and 2005. Adopted by the International Support Vessel Owners' Association (ISOA), London.
Explanatory notes are available from BIMCO at www.bimco.org.

## PART II
## SUPPLYTIME 2005 Time Charter Party for Offshore Service Vessels

234 hereunder will be rendered as requested by the
235 Charterers, subject always to the exclusive right of the
236 Owners or the Master of the Vessel to determine
237 whether operation of the Vessel may be safely
238 undertaken. In the performance of the Charter Party,
239 the Owners are deemed to be an independent
240 contractor, the Charterers being concerned only with
241 the results of the services performed.

242 **8. Owners to Provide**
243 (a) The Owners shall provide and pay for all
244 provisions, wages and all other expenses of the Master,
245 Officers and Crew; all maintenance and repair of the
246 Vessel's hull, machinery and equipment as specified in
247 ANNEX "A"; also, except as otherwise provided in this
248 Charter Party, for all insurance on the Vessel, all dues
249 and charges directly related to the Vessel's flag and/or
250 registration, all deck, cabin and engineroom stores,
251 cordage required for ordinary ship's purposes mooring
252 alongside in harbour, and all fumigation expenses and
253 de-ratisation certificates. The Owners' obligations under
254 this Clause extend to cover all liabilities for consular
255 charges appertaining to the Master, Officers and Crew,
256 customs or import duties arising at any time during the
257 performance of this Charter Party in relation to the
258 personal effects of the Master, Officers and Crew, and
259 in relation to the stores, provisions and other matters
260 as aforesaid which the Owners are to provide and/or
261 pay for and the Owners shall refund to the Charterers
262 any sums they or their agents may have paid or been
263 compelled to pay in respect of such liability.

264 (b) On delivery the Vessel shall be equipped, if
265 appropriate, at the Owners' expense with any towing and
266 anchor handling equipment specified in ANNEX "A".

267 **9. Charterers to Provide**
268 (a) While the Vessel is on hire the Charterers shall
269 provide and pay for all fuel, lubricants, water,
270 dispersants, ~~firefighting foam and transport thereof~~, port
271 charges, pilotage and boatmen and canal steersmen
272 (whether compulsory or not), launch hire (unless
273 incurred in connection with the Owners' business), light
274 dues, tug assistance, canal, dock, harbour, tonnage and
275 other dues and charges, agencies and commissions
276 incurred on the Charterers' business, costs for security
277 or other watchmen, and of quarantine (if occasioned
278 by the nature of the cargo carried or the ports visited
279 whilst employed under this Charter Party but not
280 otherwise).

281 (b) At all times the Charterers shall provide and pay
282 for the loading and unloading of cargoes so far as not
283 done by the Vessel's crew, cleaning of cargo tanks, all
284 necessary dunnage, uprights and shoring equipment
285 for securing deck cargo, all cordage except as to be
286 provided by the Owners, all ropes, slings and special
287 runners (including bulk cargo discharge hoses) actually
288 used for loading and discharging, inert gas required for
289 the protection of cargo, and electrodes used for offshore
290 works, and shall reimburse the Owners for the actual
291 cost of replacement of special mooring lines to offshore
292 units, wires, nylon spring lines etc. used for offshore
293 works, all hose connections and adaptors, and further,
294 shall refill oxygen/acetylene bottles used for offshore
295 works.

296 (c) Upon entering into this Charter Party or in any
297 event no later than the time of delivery of the Vessel
298 the Charterers shall provide the Owners with copies of
299 any operational plans or documents which are
300 necessary for the safe and efficient operation of the
301 Vessel. All documents received by the Owners shall be
302 returned to the Charterers on redelivery.

303 (d) The Charterers shall pay for customs duties, all
304 permits, import duties (including costs involved in
305 establishing temporary or permanent importation
306 bonds), and clearance expenses, both for the Vessel
307 and/or equipment, required for or arising out of this
308 Charter Party.

309 (e) The Charterers shall pay for any replacement of
310 any anchor handling/towing/lifting wires and accessories
311 which have been placed on board by the Owners or the
312 Charterers, should such equipment be lost, damaged or
313 become unserviceable, other than as a result of the
314 Owners' negligence.

315 (f) The Charterers shall pay for any fines, taxes or
316 imposts levied in the event that contraband and/or
317 unmanifested drugs and/or cargoes are found to have
318 been shipped as part of the cargo and/or in containers
319 on board. The Vessel shall remain on hire during any
320 time lost as a result thereof. However, if it is established
321 that the Master, Officers and/or Crew are involved in
322 smuggling then any financial security required shall be
323 provided by the Owners.

324 **10. Bunkers**
325 (a) Quantity at Delivery/Redelivery. – The Vessel shall
326 be delivered with at least the quantity of fuel as stated
327 in Box 19 (i) and the Vessel shall be redelivered with
328 about the same quantity as on delivery, provided always
329 that the quantity of fuels at redelivery is at least sufficient
330 to allow the Vessel to safely reach the nearest port at
331 which fuels of the required type or better are available.

332 (b) Purchase Price. – The Charterers shall purchase
333 ~~the fuels on board~~ and supply fuel at delivery at the price prevailing at
334 the time and port of delivery unless otherwise stated in
335 Box 19 (ii). ~~and the Owners shall purchase the fuels on~~
336 ~~board at redelivery at the price prevailing at the time~~
337 ~~and port of redelivery unless otherwise stated in Box~~
338 ~~19 (iii)~~. The Charterers shall purchase and supply the lubricants
339 ~~on board~~ at delivery at the list price. ~~and the Owners~~
340 ~~shall purchase the lubricants on board at redelivery at~~
341 ~~the list price.~~ Fuel and Lube Soundings to occur on Delivery and at ReDelivery to evidence amount of Fuel and Lubes onboard. At ReDelivery, any deficit to be paid by the Charterer to the Owner, or any surplus shall be credited by the Owner to the Charterer. Charterers have the option to accept Tug's provided Fuel and Lube soundings as evidence in lieu of Surveys. At time of 'Off Hire', Fuel and Lubes to be reconciled and credits/payments as applicable to be made at the same Price as last paid by whichever party made the last Fuel and Lubes arrangement.

342 (c) Bunkering. – The Charterers shall supply fuel of the
343 specifications and grades stated in Box 19 (iv). The fuels
344 shall be of a stable and homogeneous nature and unless
345 otherwise agreed in writing, shall comply with ISO
346 standard 8217:1996 or any subsequent amendments
347 thereof as well as with the relevant provisions of

Copyright © 2005 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this BIMCO SmartCon document will constitute an infringement of BIMCO's copyright. First published 1975. Revised 1989 and 2005. Adopted by the International Support Vessel Owners' Association (ISOA), London.
Explanatory notes are available from BIMCO at www.bimco.org.

## PART II
### SUPPLYTIME 2005 Time Charter Party for Offshore Service Vessels

| | |
|---|---|
| 348 MARPOL. The Chief Engineer shall co-operate with the | 410 Owners". |
| 349 Charterers' bunkering agents and fuel suppliers and | 411 (ii) Except as otherwise provided in this Charter Party, |
| 350 comply with their requirements during bunkering, | 412 loss, damages, expense or delay (excluding |
| 351 including but not limited to checking, verifying and | 413 consequential loss, damages, expense or delay) |
| 352 acknowledging sampling, reading or soundings, meters | 414 caused by failure on the part of the Charterers to |
| 353 etc. before, during and/or after delivery of fuels. During | 415 comply with this Clause shall be for the Charterers' |
| 354 delivery four representative samples of all fuels shall be | 416 account. |
| 355 taken at a point as close as possible to the Vessel's | 417 (c) Notwithstanding anything else contained in this |
| 356 bunker manifold. The samples shall be labelled and | 418 Charter Party all delay, costs or expenses whatsoever |
| 357 sealed and signed by suppliers, Chief Engineer and the | 419 arising out of or related to security regulations or |
| 358 Charterers or their agents. Two samples shall be retained | 420 measures required by the port facility or any relevant |
| 359 by the suppliers and one each by the Vessel and the | 421 authority in accordance with the ISPS Code/MTSA |
| 360 Charterers. If any claim should arise in respect of the | 422 including, but not limited to, security guards, launch |
| 361 quality or specification or grades of the fuels supplied, | 423 services, tug escorts, port security fees or taxes and |
| 362 the samples of the fuels retained as aforesaid shall be | 424 inspections, shall be for the Charterers' account, unless |
| 363 analysed by a qualified and independent laboratory. | 425 such costs or expenses result solely from the Owners' |
| 364 (d) Liability . – The Charterers shall be liable for any | 426 negligence. All measures required by the Owners to |
| 365 loss or damage to the Owners caused by the supply of | 427 comply with the Ship Security Plan shall be for the |
| 366 unsuitable fuels or fuels which do not comply with the | 428 Owners' account. |
| 367 specifications and grades set out in Box 19 (iv) and the | 429 (d) If either party makes any payment which is for the |
| 368 Owners shall not be held liable for any reduction in the | 430 other party's account according to this Clause, the other |
| 369 Vessel's speed performance and/or increased bunker | 431 party shall indemnify the paying party. |
| 370 consumption nor for any time lost and any other | 432 **12. Hire and Payments** |
| 371 consequences arising as a result of such supply. | 433 (a) Hire. - The Charterers shall pay Hire for the Vessel |
| 372 **11. BIMCO ISPS/MTSA Clause for Time Charter Parties** | 434 at the rate stated in Box 20 per day or pro rata for part |
| 373 (a)(i) The Owners shall comply with the requirements | 435 thereof from the time that the Vessel is delivered to the |
| 374 of the International Code for the Security of Ships | 436 Charterers until the expiration or earlier termination of |
| 375 and of Port Facilities and the relevant amendments | 437 this Charter Party. |
| 376 to Chapter XI of SOLAS (ISPS Code) relating to | 438 (b) Extension Hire. - If the option to extend the Charter |
| 377 the Vessel and "the Company" (as defined by the | 439 Period under Clause 1(b) is exercised, Hire for such |
| 378 ISPS Code). If trading to or from the United States | 440 extension shall, unless stated in Box 21, be agreed |
| 379 or passing through United States waters, the | 441 between the Owners and the Charterers. Should the |
| 380 Owners shall also comply with the requirements | 442 parties fail to reach an agreement, then the Charterers' |
| 381 of the US Maritime Transportation Security Act | 443 shall not have the option to extend the Charter Period. |
| 382 2002 (MTSA) relating to the Vessel and the | 444 (c) Adjustment of Hire. - The rate of hire shall be |
| 383 "Owner" (as defined by the MTSA). | 445 adjusted to reflect documented changes, after the date |
| 384 (ii) Upon request the Owners shall provide a copy of | 446 of entering into the Charter Party or the date of |
| 385 the relevant International Ship Security Certificate | 447 commencement of employment, whichever is earlier, |
| 386 (or the Interim International Ship Security | 448 in the Owners' costs arising from changes in the |
| 387 Certificate) to the Charterers. The Owners shall | 449 Charterers' requirements, or regulations governing the |
| 388 provide the Charterers with the full style contact | 450 Vessel and/or its Crew or this Charter Party or the |
| 389 details of the Company Security Officer (CSO). | 451 application thereof. |
| 390 (iii) Except as otherwise provided in this Charter Party, | 452 (d) Invoicing. - All invoices shall be issued in the |
| 391 loss, damages, expense or delay (excluding | 453 contract currency stated in Box 20. In respect of |
| 392 consequential loss, damages, expense or delay) | 454 reimbursable expenses incurred in currencies other than |
| 393 caused by failure on the part of the Owners or | 455 the contract currency, the rate of exchange into the |
| 394 "the Company"/"Owner" to comply with the | 456 contract currency shall be that quoted by the Central |
| 395 requirements of the ISPS Code/MTSA or this | 457 Bank of the country of such other currency as at the |
| 396 Clause shall be for the Owners' account. | 458 date of the Owners' invoice. Invoices covering Hire and |
| 397 (b) (i) The Charterers shall provide the Owners and | 459 any other payments due shall be issued ~~monthly~~ as |
| 398 the Master with their full style contact details and, | 460 stated in Box 22(i)~~, or at the expiration or earlier~~ |
| 399 upon request, any other information the Owners | 461 ~~termination of this Charter Party~~. Notwithstanding the |
| 400 require to comply with the ISPS Code/MTSA. | 462 foregoing, bunkers and lubricants on board at delivery |
| 401 Furthermore, the Charterers shall ensure that all | 463 shall be invoiced at the time of delivery. |
| 402 sub-charter parties they enter into during the | 464 (e) Payments. - Payments of Hire, bunker invoices |
| 403 period of this Charter Party contain the following | 465 and disbursements for the Charterers' account shall be |
| 404 provision: | 466 received within the number of days stated in Box 24, |
| 405 "The Charterers shall provide the Owners with | 467 ~~from the date of receipt of the invoice~~. Payment shall |
| 406 their full style contact details and, where sub- | 468 be made in the currency stated in Box 20 in full without |
| 407 letting is permitted under the terms of the charter | 469 discount to the account stated in Box 23. |
| 408 party, shall ensure that the contact details of all | 470 However, any advances for disbursements made on |
| 409 sub-charterers are likewise provided to the | |

Copyright © 2005 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this BIMCO SmartCon document will constitute an infringement of BIMCO's copyright. First published 1975. Revised 1989 and 2005. Adopted by the International Support Vessel Owners' Association (ISOA), London.
Explanatory notes are available from BIMCO at www.bimco.org.

## PART II
### SUPPLYTIME 2005 Time Charter Party for Offshore Service Vessels

471 behalf of and approved by the Owners may be deducted
472 from Hire due.
473 If payment is not received by the Owners within 5
474 banking days following the due date the Owners are
475 entitled to charge interest at the rate stated in Box 25
476 on the amount outstanding from and including the due
477 date until payment is received.
478 Where an invoice is disputed, the Charterers shall notify
479 the Owners before the due date and in any event pay
480 the undisputed portion of the invoice but shall be entitled
481 to withhold payment of the disputed portion provided
482 that such portion is reasonably disputed and the
483 Charterers specify such reason. Interest will be
484 chargeable at the rate stated in Box 25 on such disputed
485 amounts where resolved in favour of the Owners.
486 Should the Owners prove the validity of the disputed
487 portion of the invoice, balance payment shall be received
488 by the Owners within 5 banking days after the dispute
489 is resolved. Should the Charterers' claim be valid, a
490 corrected invoice shall be issued by the Owners.

491 **(f)** (i) Where there is a failure to pay Hire by the due
492 date, the Owners shall notify the Charterers in
493 writing of such failure and further may also suspend
494 the performance of any or all of their obligations
495 under this Charter Party until such time as all the
496 Hire due to the Owners under the Charter Party
497 has been received by the Owners. Throughout any
498 period of suspended performance under this
499 Clause, the Vessel is to be and shall remain on
500 Hire. The Owners' right to suspend performance
501 under this Clause shall be without prejudice to any
502 other rights they may have under this Charter Party.

503 (ii) If after 5 days of the written notification referred
504 to in Clause 12(f)(i) the Hire has still not been
505 received the Owners may at any time while Hire
506 remains outstanding withdraw the Vessel from the
507 Charter Party. The right to withdraw is to be
508 exercised promptly and in writing and is not
509 dependent upon the Owners first exercising the
510 right to suspend performance of their obligations
511 under the Charter Party pursuant to Clause 12(f)(i)
512 above. The receipt by the Owners of a payment
513 from the Charterers after the five day period
514 referred to above has expired but prior to the
515 notice of withdrawal shall not be deemed a waiver
516 of the Owners' right to cancel the Charter Party.

517 (iii) Where the Owners choose not to exercise any of
518 the rights afforded to them by this Clause in
519 respect of any particular late payment of Hire, or
520 a series of late payments of Hire, under the
521 Charter Party, this shall not be construed as a
522 waiver of their right either to suspend performance
523 under Clause 12(f)(i) or to withdraw the Vessel
524 from the Charter Party under Clause 12(f)(ii) in
525 respect of any subsequent late payment under
526 this Charter Party.

527 (iv) The Charterers shall indemnify the Owners in
528 respect of any liabilities incurred by the Owners
529 under the Bill of Lading or any other contract of
530 carriage as a consequence of the Owners' proper
531 suspension of and/or withdrawal from any or all
532 of their obligations under this Charter Party.

533 ~~(g) Audit. – The Charterers shall have the right to~~
534 ~~appoint an independent chartered accountant to audit~~
535 ~~the Owners' books directly related to work performed~~
536 ~~under this Charter Party at any time after the conclusion~~
537 ~~of the Charter Party, up to the expiry of the period stated~~
538 ~~in Box 26, to determine the validity of the Owners'~~
539 ~~charges hereunder. The Owners undertake to make~~
540 ~~their records available for such purposes at their~~
541 ~~principal place of business during normal working hours.~~
542 ~~Any discrepancies discovered in payments made shall~~
543 ~~be promptly resolved by invoice or credit as appropriate.~~

544 **13. Suspension of Hire**
545 **(a)** If as a result of any deficiency of Crew or of the
546 Owners' stores, strike of Master, Officers and Crew,
547 breakdown of machinery, damage to hull or other
548 accidents to the Vessel, the Vessel is prevented from
549 working, no Hire shall be payable in respect of any time
550 lost and any Hire paid in advance shall be adjusted
551 accordingly provided always however that Hire shall
552 not cease in the event of the Vessel being prevented
553 from working as aforesaid as a result of:

554 (i) the carriage of cargo as noted in Clause 6(c)(iii)
555 and (iv);

556 (ii) quarantine or risk of quarantine unless caused by
557 the Master, Officers or Crew having communication
558 with the shore at any infected area not in
559 connection with the employment of the Vessel
560 without the consent or the instructions of the
561 Charterers;

562 (iii) deviation from her Charter Party duties or
563 exposure to abnormal risks at the request of the
564 Charterers;

565 (iv) detention in consequence of being driven into port
566 or to anchorage through stress of weather or
567 trading to shallow harbours or to river or ports
568 with bars or suffering an accident to her cargo,
569 when the expenses resulting from such detention
570 shall be for the Charterers' account howsoever
571 incurred;

572 (v) detention or damage by ice;

573 (vi) any act or omission of the Charterers, their
574 servants or agents.

575 **(b)** Liability for Vessel not Working. – The Owners'
576 liability for any loss, damage or delay sustained by the
577 Charterers as a result of the Vessel being prevented
578 from working by any cause whatsoever shall be limited
579 to suspension of hire, except as provided in Clause
580 11(a)(iii).

581 **(c)** Maintenance and Drydocking. – Notwithstanding
582 Clause 13(a), the Charterers shall grant the Owners a
583 maximum of 24 hours on hire, which shall be
584 cumulative, per month or pro rata for part of a month
585 from the commencement of the Charter Period for
586 maintenance and repairs including drydocking
587 (hereinafter referred to as "maintenance allowance").
588 The Vessel shall be drydocked at regular intervals. The
589 Charterers shall place the Vessel at the Owners'
590 disposal clean of cargo, at a port (to be nominated by
591 the Owners at a later date) having facilities suitable to
592 the Owners for the purpose of such drydocking.

Copyright © 2005 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this BIMCO SmartCon document will constitute an infringement of BIMCO's copyright. First published 1975. Revised 1989 and 2005. Adopted by the International Support Vessel Owners' Association (ISOA), London.
Explanatory notes are available from BIMCO at www.bimco.org.

## PART II
### SUPPLYTIME 2005 Time Charter Party for Offshore Service Vessels

593 During reasonable voyage time taken in transits
594 between such port and Area of Operation the Vessel
595 shall be on hire and such time shall not be counted
596 against the accumulated maintenance allowance.
597 Hire shall be suspended during any time taken in
598 maintenance repairs and drydocking in excess of the
599 accumulated maintenance allowance.
600 In the event of less time being taken by the Owners for
601 repairs and drydocking or, alternatively, the Charterers
602 not making the Vessel available for all or part of this
603 time, the Charterers shall, upon expiration or earlier
604 termination of the Charter Party, pay the equivalent of
605 the daily rate of Hire then prevailing in addition to Hire
606 otherwise due under this Charter Party in respect of all
607 such time not so taken or made available.
608 Upon commencement of the Charter Period, the Owners
609 agree to furnish the Charterers with the Owners'
610 proposed drydocking schedule and the Charterers
611 agree to make every reasonable effort to assist the
612 Owners in adhering to such predetermined drydocking
613 schedule for the Vessel.

614 **14. Liabilities and Indemnities**
615 **(a)** Definitions
616 For the purpose of this Clause "Owners' Group" shall
617 mean: the Owners, and their contractors and sub-
618 contractors , and Employees of any of the foregoing.
619 For the purpose of this Clause "Charterers' Group" shall
620 mean: the Charterers, and their contractors, sub-
621 contractors, co-venturers and customers (having a
622 contractual relationship with the Charterers, always with
623 respect to the job or project on which the Vessel is
624 employed), and Employees of any of the foregoing.

625 **(b)** Knock for Knock
626 (i) Owners. - Notwithstanding anything else contained
627 in this Charter Party excepting Clauses 6(c)(iii),
628 9(b), 9(e), 9(f), 10(d), 11, 12(f)(iv), 14 (d), 15 (b),
629 18(c), 26 and 27, the Charterers shall not be
630 responsible for loss of or damage to the property
631 of any member of the Owners' Group, including
632 the Vessel, or for personal injury or death of any
633 member of the Owners' Group arising out of or in
634 any way connected with the performance of this
635 Charter Party, even if such loss, damage, injury or
636 death is caused wholly or partially by the act,
637 neglect, or default of the Charterers' Group, and
638 even if such loss, damage, injury or death is caused
639 wholly or partially by unseaworthiness of any
640 vessel; and the Owners shall indemnify, protect,
641 defend and hold harmless the Charterers from any
642 and against all claims, costs, expenses, actions,
643 proceedings, suits, demands and liabilities
644 whatsoever arising out of or in connection with such
645 loss, damage, personal injury or death.

646 (ii) Charterers. - Notwithstanding anything else
647 contained in this Charter Party excepting Clause
648 11, 15(a), 16 and 26, the Owners shall not be
649 responsible for loss of, damage to, or any liability
650 arising out of anything towed by the Vessel, any
651 cargo laden upon or carried by the Vessel or her
652 tow, the property of any member of the Charterers'
653 Group , whether owned or chartered, including
654 their Offshore Units, or for personal injury or death
655 of any member of the Charterers' Group or of

656 anyone on board anything towed by the Vessel,
657 arising out of or in any way connected with the
658 performance of this Charter Party, even if such
659 loss, damage, liability, injury or death is caused
660 wholly or partially by the act, neglect or default of
661 the Owners' Group, and even if such loss,
662 damage, liability, injury or death is caused wholly
663 or partially by the unseaworthiness of any vessel;
664 and the Charterers shall indemnify, protect,
665 defend and hold harmless the Owners from any
666 and against all claims, costs, expenses, actions,
667 proceedings, suits, demands, and liabilities
668 whatsoever arising out of or in connection with
669 such loss, damage, liability, personal injury or
670 death.

671 **(c)** Consequential Damages.-
672 Neither party shall be liable to the other for any
673 consequential damages whatsoever arising out of or in
674 connection with the performance or non-performance
675 of this Charter Party, and each party shall protect, defend
676 and indemnify the other from and against all such claims
677 from any member of its Group as defined in Clause
678 14(a).
679 "Consequential damages" shall include, but not be
680 limited to, loss of use, loss of profits, shut-in or loss of
681 production and cost of insurance, whether or not
682 foreseeable at the date of this Charter Party.

683 **(d)** Limitations.-
684 Nothing contained in this Charter Party shall be
685 construed or held to deprive the Owners or the
686 Charterers, as against any person or party, including
687 as against each other, of any right to claim limitation of
688 liability provided by any applicable law, statute or
689 convention, save that nothing in this Charter Party shall
690 create any right to limit liability. Where the Owners or
691 the Charterers may seek an indemnity under the
692 provisions of this Charter Party or against each other in
693 respect of a claim brought by a third party, the Owners
694 or the Charterers shall seek to limit their liability against
695 such third party.

696 **(e)** Himalaya Clause.-
697 (i) All exceptions, exemptions, defences, immunities,
698 limitations of liability, indemnities, privileges and
699 conditions granted or provided by this Charter Party
700 or by any applicable statute, rule or regulation for
701 the benefit of the Charterers shall also apply to
702 and be for the benefit of the Charterers' parent,
703 affiliated, related and subsidiary companies; the
704 Charterers' contractors, sub-contractors, co-
705 venturers and customers (having a contractual
706 relationship with the Charterers, always with
707 respect to the job or project on which the Vessel is
708 employed) ; their respective Employees and their
709 respective underwriters.

710 (ii) All exceptions, exemptions, defences, immunities,
711 limitations of liability, indemnities, privileges and
712 conditions granted or provided by this Charter Party
713 or by any applicable statute, rule or regulation for
714 the benefit of the Owners shall also apply to and
715 be for the benefit of the Owners' parent, affiliated,
716 related and subsidiary companies, the Owners'
717 contractors, sub-contractors, the Vessel, its Master,
718 Officers and Crew, its registered owner, its operator,

Copyright © 2005 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this BIMCO SmartCon document will constitute an infringement of BIMCO's copyright. First published 1975. Revised 1989 and 2005. Adopted by the International Support Vessel Owners' Association (ISOA), London.
Explanatory notes are available from BIMCO at www.bimco.org.

# PART II
## SUPPLYTIME 2005 Time Charter Party for Offshore Service Vessels

719 its demise charterer(s), their respective Employees
720 and their respective underwriters.

721 (iii) The Owners or the Charterers shall be deemed
722 to be acting as agent or trustee of and for the
723 benefit of all such persons and parties set forth
724 above, but only for the limited purpose of
725 contracting for the extension of such benefits to
726 such persons and parties.

727 **(f)** <u>Hazardous or Noxious Substances.</u>
728 Notwithstanding any other provision of this Charter Party
729 to the contrary, the Charterers shall always be
730 responsible for any losses, damages or liabilities
731 suffered by the Owners' Group, by the Charterers, or
732 by third parties, with respect to the Vessel or other
733 property, personal injury or death, pollution or otherwise,
734 which losses, damages or liabilities are caused, directly
735 or indirectly, as a result of the Vessel's carriage of any
736 hazardous or noxious substances in whatever form as
737 ordered by the Charterers, and the Charterers shall
738 defend, indemnify the Owners and hold the Owners
739 harmless for any expense, loss or liability whatsoever
740 or howsoever arising with respect to the carriage of
741 hazardous or noxious substances.

742 **15. Pollution**
743 **(a)** Except as otherwise provided for in Clause 18(c)(iii),
744 the Owners shall be liable for, and agree to indemnify,
745 defend and hold harmless the Charterers against all
746 claims, costs, expenses, actions, proceedings, suits,
747 demands and liabilities whatsoever arising out of actual
748 or threatened pollution damage and the cost of cleanup
749 or control thereof arising from acts or omissions of the
750 Owners or their personnel which cause or allow
751 discharge, spills or leaks from the Vessel, except as may
752 emanate from cargo thereon or therein.

753 **(b)** The Charterers shall be liable for and agree to
754 indemnify, defend and hold harmless the Owners from
755 all claims, costs, expenses, actions, proceedings, suits,
756 demands, liabilities, loss or damage whatsoever arising
757 out of or resulting from any other actual or threatened
758 pollution damage, even where caused wholly or partially
759 by the act, neglect or default of the Owners, their
760 Employees, contractors or sub-contractors or by the
761 unseaworthiness of the Vessel.

762 **(c)** The Charterers shall, upon giving notice to the
763 Owners or the Master, have the right (but shall not be
764 obliged) to place on board the Vessel and/or have in
765 attendance at the site of any pollution or threatened
766 incident one or more Charterers' representative to
767 observe the measures being taken by Owners and/or
768 national or local authorities or their respective servants,
769 agents or contractors to prevent or minimise pollution
770 damage and to provide advice, equipment or manpower
771 or undertake such other measures, at Charterers' risk
772 and expense, as are permitted under applicable law
773 and as Charterers believe are reasonably necessary to
774 prevent or minimise such pollution damage or to remove
775 the threat of pollution damage.

776 **16. Wreck Removal**
777 If the Vessel becomes a wreck and is an obstruction to
778 navigation and has to be removed by order of any lawful
779 authority having jurisdiction over the area where the
780 Vessel is placed or as a result of compulsory law, the
781 Owners shall be liable for any and all expenses in
782 connection with the raising, removal, destruction,
783 lighting or marking of the Vessel.

784 **17. Insurance**
785 **(a) (i)** The Owners shall procure and maintain in
786 effect for the duration of this Charter Party, with
787 reputable insurers, the insurances set forth in
788 ANNEX "B".

789 Policy limits shall not be less than those indicated.
790 Reasonable deductibles are acceptable and shall
791 be for the account of the Owners.

792 **(ii)** The Charterers shall upon request be named as
793 co-insured. The Owners shall upon request cause
794 insurers to waive subrogation rights against the
795 Charterers (as encompassed in Clause 14(e)(i)).
796 Co-insurance and/or waivers of subrogation shall
797 be given only insofar as these relate to liabilities
798 which are properly the responsibility of the Owners
799 under the terms of this Charter Party.

800 **(b)** The Owners shall upon request furnish the
801 Charterers with copies of certificates of insurance which
802 provide sufficient information to verify that the Owners
803 have complied with the insurance requirements of this
804 Charter Party.

805 **(c)** If the Owners fail to comply with the aforesaid
806 insurance requirements, the Charterers may, without
807 prejudice to any other rights or remedies under this
808 Charter Party, purchase similar coverage and deduct
809 the cost thereof from any payment due to the Owners
810 under this Charter Party.

811 **18. Saving of Life and Salvage**
812 **(a)** The Vessel shall be permitted to deviate for the
813 purpose of saving life at sea without prior approval of
814 or notice to the Charterers and without loss of Hire
815 provided however that notice of such deviation is given
816 as soon as possible.

817 **(b)** Subject to the Charterers' consent, which shall not
818 be unreasonably withheld, the Vessel shall be at liberty
819 to undertake attempts at salvage, it being understood
820 that the Vessel shall be off-hire from the time she leaves
821 port or commences to deviate and she shall remain
822 off-hire until she is again in every way ready to resume
823 the Charterers' service at a position which is not less
824 favourable to the Charterers than the position at the
825 time of leaving port or deviating for the salvage services.
826 All salvage monies earned by the Vessel shall be divided
827 equally between the Owners and the Charterers, after
828 deducting the Master's, Officers' and Crew's share, legal
829 expenses, value of fuel and lubricants consumed, Hire
830 of the Vessel lost by the Owners during the salvage,
831 repairs to damage sustained, if any, and any other
832 extraordinary loss or expense sustained as a result of
833 the salvage.
834 The Charterers shall be bound by all measures taken
835 by the Owners in order to secure payment of salvage
836 and to fix its amount.

837 **(c)** The Owners shall waive their right to claim any
838 award for salvage performed on property owned by or
839 contracted to the Charterers, always provided such
840 property was the object of the operation the Vessel was
841 chartered for, and the Vessel shall remain on hire when

Copyright © 2005 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this BIMCO SmartCon document will constitute an infringement of BIMCO's copyright. First published 1975. Revised 1989 and 2005. Adopted by the International Support Vessel Owners' Association (ISOA), London.
Explanatory notes are available from BIMCO at www.bimco.org.

## PART II
### SUPPLYTIME 2005 Time Charter Party for Offshore Service Vessels

842  rendering salvage services to such property. This waiver
843  is without prejudice to any right the Vessel's Master,
844  Officers and Crew may have under any title.
845  If the Owners render assistance to such property in
846  distress on the basis of "no claim for salvage", then,
847  notwithstanding any other provisions contained in this
848  Charter Party and even in the event of neglect or default
849  of the Owners, Master, Officers or Crew:

850  (i) The Charterers shall be responsible for and shall
851  indemnify the Owners against payments made,
852  under any legal rights, to the Master, Officers and
853  Crew in relation to such assistance.

854  (ii) The Charterers shall be responsible for and shall
855  reimburse the Owners for any loss or damage
856  sustained by the Vessel or her equipment by
857  reason of giving such assistance and shall also
858  pay the Owners' additional expenses thereby
859  incurred.

860  (iii) The Charterers shall be responsible for any actual
861  or potential spill, seepage and/or emission of any
862  pollutant howsoever caused occurring within the
863  offshore site and any pollution resulting therefrom
864  wheresoever it may occur and including but not
865  limited to the cost of such measures as are
866  reasonably necessary to prevent or mitigate
867  pollution damage, and the Charterers shall
868  indemnify the Owners against any liability, cost
869  or expense arising by reason of such actual or
870  potential spill, seepage and/or emission.

871  (iv) The Vessel shall not be off-hire as a consequence
872  of giving such assistance, or effecting repairs
873  under Clause 18(c)(ii), and time taken for such
874  repairs shall not count against time granted under
875  Clause 13(c).

876  (v) The Charterers shall indemnify the Owners
877  against any liability, cost and/or expense
878  whatsoever in respect of any loss of life, injury,
879  damage or other loss to person or property
880  howsoever arising from such assistance.

881  **19. Lien**
882  The Owners shall have a lien upon all cargoes and
883  equipment for all claims against the Charterers under
884  this Charter Party and the Charterers shall have a lien
885  on the Vessel for all monies paid in advance and not
886  earned. The Charterers will not suffer, nor permit to be
887  continued, any lien or encumbrance incurred by them
888  or their agents, which might have priority over the title
889  and interest of the Owners in the Vessel. Except as
890  provided in Clause 14, the Charterers shall indemnify
891  and hold the Owners harmless against any lien of
892  whatsoever nature arising upon the Vessel during the
893  Charter Period while she is under the control of the
894  Charterers, and against any claims against the Owners
895  arising out of the operation of the Vessel by the
896  Charterers or out of any neglect of the Charterers in
897  relation to the Vessel or the operation thereof.
898  Should the Vessel be arrested by reason of claims or
899  liens arising out of her operation hereunder, unless
900  brought about by the act or neglect of the Owners, the
901  Charterers shall at their own expense take all
902  reasonable steps to secure that within a reasonable time
903  the Vessel is released and at their own expense put up

904  bail to secure release of the Vessel.

905  **20. Sublet and Assignment**
906  (a) <u>Charterers.</u> - The Charterers shall have the option
907  of subletting, assigning or loaning the Vessel to any
908  person or company not competing with the Owners,
909  subject to the Owners' prior approval which shall not be
910  unreasonably withheld, upon giving notice in writing to
911  the Owners, but the original Charterers shall always
912  remain responsible to the Owners for due performance
913  of the Charter Party. The person or company taking such
914  subletting, assigning or loan and their contractors and
915  sub-contractors shall be deemed contractors of the
916  Charterers for all the purposes of this Charter Party.
917  The Owners make it a condition of such consent that
918  additional Hire shall be paid as agreed between the
919  Charterers and the Owners in Box 29, having regard to
920  the nature and period of any intended service of the
921  Vessel.

922  (b) <u>Owners.</u> - The Owners may not assign or transfer
923  any part of this Charter Party without the written approval
924  of the Charterers, which approval shall not be
925  unreasonably withheld. Approval by the Charterers of
926  such subletting or assignment shall not relieve the
927  Owners of their responsibility for due performance of
928  the part of the services which is sublet or assigned.

929  **21. Substitute Vessel**
930  The Owners shall be entitled at any time, whether before
931  delivery or at any other time during the Charter Period,
932  to provide a substitute vessel, subject to the Charterers'
933  prior approval which shall not be unreasonably withheld.

934  **22. BIMCO War Risks Clause "CONWARTIME 2004"**
935  (a) For the purpose of this Clause, the words:
936  (i) "Owners" shall include the shipowners, bareboat
937  charterers, disponent owners, managers or other
938  operators who are charged with the management
939  of the Vessel, and the Master; and

940  (ii) "War Risks" shall include any actual, threatened
941  or reported: war; act of war; civil war; hostilities;
942  revolution; rebellion; civil commotion; warlike
943  operations; laying of mines; acts of piracy; acts of
944  terrorists; acts of hostility or malicious damage;
945  blockades (whether imposed against all vessels
946  or imposed selectively against vessels of certain
947  flags or ownership, or against certain cargoes or
948  crews or otherwise howsoever); by any person,
949  body, terrorist or political group, or the Government
950  of any state whatsoever, which, in the reasonable
951  judgement of the Master and/or the Owners, may
952  be dangerous or are likely to be or to become
953  dangerous to the Vessel, her cargo, crew or other
954  persons on board the Vessel.

955  (b) The Vessel, unless the written consent of the
956  Owners be first obtained, shall not be ordered to or
957  required to continue to or through, any port, place, area
958  or zone (whether of land or sea), or any waterway or
959  canal, where it appears that the Vessel, her cargo, crew
960  or other persons on board the Vessel, in the reasonable
961  judgement of the Master and/or the Owners, may be,
962  or are likely to be, exposed to War Risks. Should the
963  Vessel be within any such place as aforesaid, which
964  only becomes dangerous, or is likely to be or to become
965  dangerous, after her entry into it, she shall be at liberty

Copyright © 2005 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this BIMCO SmartCon document will constitute an infringement of BIMCO's copyright. First published 1975. Revised 1989 and 2005. Adopted by the International Support Vessel Owners' Association (ISOA), London.
Explanatory notes are available from BIMCO at www.bimco.org.

966 to leave it.

967 (c) The Vessel shall not be required to load contraband
968 cargo, or to pass through any blockade, whether such
969 blockade be imposed on all vessels, or is imposed
970 selectively in any way whatsoever against vessels of
971 certain flags or ownership, or against certain cargoes
972 or crews or otherwise howsoever, or to proceed to an
973 area where she shall be subject, or is likely to be subject
974 to a belligerent's right of search and/or confiscation.

975 (d) (i)The Owners may effect war risks insurance in
976 respect of the Hull and Machinery of the
977 Vessel and their other interests (including, but not
978 limited to, loss of earnings and detention, the crew
979 and their Protection and Indemnity Risks), and
980 the premiums and/or calls therefor shall be for
981 their account.

982 (ii) If the Underwriters of such insurance should require
983 payment of premiums and/or calls because,
984 pursuant to the Charterers' orders, the Vessel is
985 within, or is due to enter and remain within, or pass
986 through any area or areas which are specified by
987 such Underwriters as being subject to additional
988 premiums because of War Risks, then the actual
989 premiums and/or calls paid shall be reimbursed
990 by the Charterers to the Owners at the same time
991 as the next payment of hire is due, or upon
992 redelivery, whichever occurs first.

993 (e) If the Owners become liable under the terms of
994 employment to pay to the crew any bonus or additional
995 wages in respect of sailing into an area which is
996 dangerous in the manner defined by the said terms,
997 then the actual bonus or additional wages paid shall be
998 reimbursed to the Owners by the Charterers at the same
999 time as the next payment of hire is due, or upon
1000 redelivery, whichever occurs first.

1001 (f) The Vessel shall have liberty:-
1002 (i) to comply with all orders, directions, recommen-
1003 dations or advice as to departure, arrival, routes,
1004 sailing in convoy, ports of call, stoppages, desti-
1005 nations, discharge of cargo, delivery, or in any
1006 other way whatsoever, which are given by the
1007 Government of the Nation under whose flag the
1008 Vessel sails, or other Government to whose laws
1009 the Owners are subject, or any other Government,
1010 body or group whatsoever acting with the power
1011 to compel compliance with their orders or direc-
1012 tions;

1013 (ii) to comply with the order, directions or recommen-
1014 dations of any war risks underwriters who have
1015 the authority to give the same under the terms of
1016 the war risks insurance;

1017 (iii) to comply with the terms of any resolution of the
1018 Security Council of the United Nations, the
1019 effective orders of any other Supranational body
1020 which has the right to issue and give the same,
1021 and with national laws aimed at enforcing the
1022 same to which the Owners are subject, and to
1023 obey the orders and directions of those who are
1024 charged with their enforcement;

1025 (iv) to discharge at any other port any cargo or part
1026 thereof which may render the Vessel liable to

1027 confiscation as a contraband carrier;

1028 (v) to call at any other port to change the crew or any
1029 part thereof or other persons on board the Vessel
1030 when there is reason to believe that they may be
1031 subject to internment, imprisonment or other
1032 sanctions.

1033 (g) If in accordance with their rights under the
1034 foregoing provisions of this Clause, the Owners shall
1035 refuse to proceed to the loading or discharging ports,
1036 or any one or more of them, they shall immediately
1037 inform the Charterers. No cargo shall be discharged at
1038 any alternative port without first giving the Charterers
1039 notice of the Owners' intention to do so and requesting
1040 them to nominate a safe port for such discharge. Failing
1041 such nomination by the Charterers within 48 hours of
1042 the receipt of such notice and request, the Owners may
1043 discharge the cargo at any safe port of their own choice.

1044 (h) If in compliance with any of the provisions of sub-
1045 clauses (b) to (g) of this Clause anything is done or not
1046 done, such shall not be deemed a deviation, but shall
1047 be considered as due fulfilment of this Charter Party.

1048 ~~23. War Cancellation Clause 2004~~
1049 ~~Either party may cancel this Charter Party on the~~
1050 ~~outbreak of war (whether there be a declaration of war~~
1051 ~~or not)~~

1052 ~~(a) between any two or more of the following countries:~~
1053 ~~the United States of America; Russia; the United~~
1054 ~~Kingdom; France; and the People's Republic of China,~~
1055 ~~or,~~

1056 ~~(b) between the countries stated in Box 30.~~

1057 ~~24. BIMCO Ice Clause for Time Charter Parties~~
1058 ~~(a) The Vessel shall not be obliged to force ice but,~~
1059 ~~subject to the Owners' prior approval having due regard~~
1060 ~~to its size, construction and class, may follow ice-~~
1061 ~~breakers.~~

1062 ~~(b) The Vessel shall not be required to enter or remain~~
1063 ~~in any icebound port or area, nor any port or area where~~
1064 ~~lights, lightships, markers or buoys have been or are~~
1065 ~~about to be withdrawn by reason of ice, nor where on~~
1066 ~~account of ice there is, in the Master's sole discretion,~~
1067 ~~a risk that, in the ordinary course of events, the Vessel~~
1068 ~~will not be able safely to enter and remain at the port or~~
1069 ~~area or to depart after completion of loading or~~
1070 ~~discharging. If, on account of ice, the Master in his sole~~
1071 ~~discretion considers it unsafe to proceed to, enter or~~
1072 ~~remain at the place of loading or discharging for fear of~~
1073 ~~the Vessel being frozen in and/or damaged, he shall~~
1074 ~~be at liberty to sail to the nearest ice-free and safe place~~
1075 ~~and there await the Charterers' instructions.~~

1076 ~~(c) Any delay or deviation caused by or resulting from~~
1077 ~~ice shall be for the Charterers' account and the Vessel~~
1078 ~~shall remain on-hire.~~

1079 ~~(d) Any additional premiums and/or calls required by~~
1080 ~~the Vessel's underwriters due to the Vessel entering or~~
1081 ~~remaining in any icebound port or area, shall be for the~~
1082 ~~Charterers' account.~~

1083 **25. Epidemic/Fever**
1084 The Vessel shall not be ordered to nor bound to enter
1085 without the Owners' written permission any place where

Copyright © 2005 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this BIMCO SmartCon document will constitute an infringement of BIMCO's copyright. First published 1975. Revised 1989 and 2005. Adopted by the International Support Vessel Owners' Association (ISOA), London.
Explanatory notes are available from BIMCO at www.bimco.org.

## PART II
## SUPPLYTIME 2005 Time Charter Party for Offshore Service Vessels

1086 fever or epidemics are prevalent or to which the Master,
1087 Officers and Crew by law are not bound to follow the
1088 Vessel.
1089 Notwithstanding the terms of Clause 13, Hire shall be
1090 paid for all time lost including any lost owing to loss of
1091 or sickness to the Master, Officers, Crew or passengers
1092 or to the action of the Crew in refusing to proceed to
1093 such place or to be exposed to such risks.

1094 **26. General Average and New Jason Clause**
1095 General Average shall be adjusted and settled in
1096 ~~London~~ Houston, Texas, USA unless otherwise stated in Box
      31, according
1097 to York-Antwerp Rules, 1994.
1098 Hire shall not contribute to General Average. Should
1099 adjustment be made in accordance with the law and
1100 practice of the United States of America, the following
1101 provision shall apply:
1102 "In the event of accident, danger, damage or disaster
1103 before or after the commencement of the voyage,
1104 resulting from any cause whatsoever, whether due to
1105 negligence or not, for which, or for the consequence of
1106 which, the Owners are not responsible, by statute,
1107 contract or otherwise, the cargo, shippers, consignees
1108 or owners of the cargo shall contribute with the Owners
1109 in General Average to the payment of any sacrifices,
1110 loss or expenses of a General Average nature that may
1111 be made or incurred and shall pay salvage and special
1112 charges incurred in respect of the cargo.
1113 If a salving vessel is owned or operated by the Owners,
1114 salvage shall be paid for as fully as if the said salving
1115 vessel or vessels belonged to strangers. Such deposit
1116 as the Owners, or their agents, may deem sufficient to
1117 cover the estimated contribution of the cargo and any
1118 salvage and special charges thereon shall, if required,
1119 be made by the cargo, shippers, consignees or owners
1120 of the cargo to the Owners before delivery".

1121 **27. Both-to-Blame Collision Clause**
1122 If the Vessel comes into collision with another ship as a
1123 result of the negligence of the other ship and any act,
1124 neglect or default of the Master, mariner, pilot or the
1125 servants of the Owners in the navigation or the
1126 management of the Vessel, the Charterers will
1127 indemnify the Owners against all loss or liability to the
1128 other or non-carrying ship or her owners insofar as such
1129 loss or liability represent loss of or damage to, or any
1130 claim whatsoever of the owners of any goods carried
1131 under this Charter Party paid or payable by the other or
1132 non-carrying ship or her owners to the owners of the
1133 said goods and set-off, recouped or recovered by the
1134 other or non-carrying ship or her owners as part of their
1135 claim against the Vessel or the Owners. The foregoing
1136 provisions shall also apply where the owners, operators
1137 or those in charge of any ship or ships or objects other
1138 than or in addition to the colliding ships or objects are
1139 at fault in respect of a collision or contact.

1140 **28. Health and Safety**
1141 The Owners shall comply with and adhere to all
1142 applicable international, national and local regulations
1143 pertaining to health and safety, and such Charterers'
1144 instructions as may be appended hereto.

1145 **29. Drugs and Alcohol Policy**
1146 The Owners undertake that they have, and shall maintain
1147 for the duration of this Charter Party, a policy on Drugs

1148 and Alcohol Abuse applicable to the Vessel (the "D & A
1149 Policy") that meets or exceeds the standards in the
1150 OCIMF Guidelines for the Control of Drugs and Alcohol
1151 Onboard Ship 1995 as amended from time to time.
1152 The Owners shall exercise due diligence to ensure that
1153 the D & A Policy is understood and complied with on
1154 and about the Vessel. An actual impairment, shall not
1155 in and of itself mean that the Owners have failed to
1156 exercise due diligence.

1157 **30. Taxes**
1158 ~~Within the day rate the Owners shall be responsible for~~
1159 ~~the taxes stated in Box 32 and the~~ Charterers shall be
1160 responsible for all ~~other~~ taxes.
1161 ~~In the event of change in the Area of Operation or~~
1162 ~~change in local regulation and/or interpretation thereof,~~
1163 ~~resulting in an unavoidable and documented change of~~
1164 ~~the Owners' tax liability after the date of entering into~~
1165 ~~the Charter Party or the date of commencement of~~
1166 ~~employment, whichever is the earlier, Hire shall be~~
1167 ~~adjusted accordingly.~~ Owners are responsible for their own
      customary taxes, e.g. income tax, etc.

1168 **31. Early Termination**
1169 ~~(a) At Charterers' Convenience. - The Charterers may~~
1170 ~~terminate this Charter Party at any time by giving the~~
1171 ~~Owners written notice of termination as stated in Box~~
1172 ~~14, upon expiry of which, this Charter Party will~~
1173 ~~terminate. Upon such termination, Charterers shall pay~~
1174 ~~the compensation for early termination stated in Box~~
1175 ~~13 and the demobilisation charge stated in Box 15, as~~
1176 ~~well as Hire or other payments due under the Charter~~
1177 ~~Party up to the time of termination. Should Box 13 be~~
1178 ~~left blank, Clause 31(a) shall not apply.~~

1179 **(b) For Cause.** - If either party becomes informed of
1180 the occurrence of any event described in this Clause
1181 that party shall so notify the other party promptly in
1182 writing and in any case within 3 days after such
1183 information is received. If the occurrence has not ceased
1184 within 3 days after such notification has been given,
1185 this Charter Party may be terminated by either party,
1186 without prejudice to any other rights which either party
1187 may have, under any of the following circumstances:

1188 (i) **Requisition.** - If the government of the state of
1189 registry and/or the flag of the Vessel, or any
1190 agency thereof, requisitions for hire or title or
1191 otherwise takes possession of the Vessel during
1192 the Charter Period.

1193 (ii) **Confiscation.** - If any government, individual or
1194 group, whether or not purporting to act as a
1195 government or on behalf of any government,
1196 confiscates, requisitions, expropriates, seizes or
1197 otherwise takes possession of the Vessel during
1198 the Charter Period (other than by way of arrest
1199 for the purpose of obtaining security).

1200 (iii) **Bankruptcy.** - In the event of an order being made
1201 or resolution passed for the winding up, dissolu-
1202 tion, liquidation or bankruptcy of either party (oth-
1203 erwise than for the purpose of reconstruction or
1204 amalgamation) or if a receiver is appointed or if it
1205 suspends payment or ceases to carry on business.

1206 (iv) **Loss of Vessel.** – If the Vessel is lost or becomes
1207 a constructive total loss, or is missing unless the

Copyright © 2005 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this BIMCO SmartCon document will constitute an infringement of BIMCO's copyright. First published 1975. Revised 1989 and 2005. Adopted by the International Support Vessel Owners' Association (ISOA), London.
Explanatory notes are available from BIMCO at www.bimco.org.

## PART II
### SUPPLYTIME 2005 Time Charter Party for Offshore Service Vessels

1208 Owners promptly state their intention to provide,
1209 and do in fact provide, within 14 days of the Vessel
1210 being lost or missing, at the port or place from
1211 which the Vessel last sailed (or some other
1212 mutually acceptable port or place) a substitute
1213 vessel pursuant to Clause 21. In the case of
1214 termination, Hire shall cease from the date the
1215 Vessel was lost or, in the event of a constructive
1216 total loss, from the date of the event giving rise to
1217 such loss. If the date of loss cannot be ascertained
1218 or the Vessel is missing, payment of Hire shall
1219 cease from the date the Vessel was last reported.

1220 (v) <u>Breakdown.</u> - If, at any time during the term of
1221 this Charter Party a breakdown of the Owners'
1222 equipment or Vessel result in the Owners being
1223 unable to perform their obligations hereunder for
1224 a period exceeding that stated in Box 33 and have
1225 not initiated reasonable steps within 48 hours to
1226 remedy the non-performance or provided a
1227 substitute vessel pursuant to Clause 21.

1228 (vi) <u>Force Majeure.</u> - If a force majeure condition as
1229 defined in Clause 32 prevents or hinders the
1230 performance of the Charter Party for a period
1231 exceeding 15 consecutive days from the time at
1232 which the impediment causes the failure to
1233 perform if notice is given without delay or, if notice
1234 is not given without delay, from the time at which
1235 notice thereof reaches the other party.

1236 (vii) <u>Default.</u> - If either party is in repudiatory breach
1237 of its obligations hereunder.
1238 Termination as a result of any of the above mentioned
1239 causes shall not relieve the Charterers of any obligation
1240 for Hire and any other payments.

1241 **32. Force Majeure**
1242 Neither party shall be liable for any loss, damage or
1243 delay due to any of the following force majeure events
1244 and/or conditions to the extent the party invoking force
1245 majeure is prevented or hindered from performing any
1246 or all of their obligations under this Charter Party,
1247 provided they have made all reasonable efforts to avoid,
1248 minimize or prevent the effect of such events and/or
1249 conditions:

1250 (a) acts of God;

1251 (b) any Government requisition, control, intervention,
1252 requirement or interference;

1253 (c) any circumstances arising out of war, threatened
1254 act of war or warlike operations, acts of terrorism,
1255 sabotage or piracy, or the consequences thereof;

1256 (d) riots, civil commotion, blockades or embargoes;

1257 (e) epidemics;

1258 (f) earthquakes, landslides, floods or other extraor-
1259 dinary weather conditions;

1260 (g) strikes, lockouts or other industrial action, unless
1261 limited to the Employees of the party seeking to invoke
1262 force majeure;

1263 (h) fire, accident, explosion except where caused by
1264 negligence of the party seeking to invoke force majeure;
1265 (i) any other similar cause beyond the reasonable
1266 control of either party.

1267 The party seeking to invoke force majeure shall notify
1268 the other party in writing within 2 working days of the
1269 occurrence of any such event/condition.

1270 **33. Confidentiality**
1271 All information or data provided or obtained in
1272 connection with the performance of this Charter Party
1273 is and shall remain confidential and not be disclosed
1274 without the prior written consent of the other party. The
1275 parties shall use their best efforts to ensure that such
1276 information shall not be disclosed to any third party by
1277 any of their sub-contractors, Employees and agents.
1278 This Clause shall not apply to any information or data
1279 that has already been published or is in the public
1280 domain.
1281 All information and data provided by a party is and shall
1282 remain the property of that party.

1283 **34. BIMCO Dispute Resolution Clause**
1284 ~~*(a) This Charter Party shall be governed by and~~
1285 ~~construed in accordance with English law and any~~
1286 ~~dispute arising out of or in connection with this Charter~~
1287 ~~Party shall be referred to arbitration in London in~~
1288 ~~accordance with the Arbitration Act 1996 or any statutory~~
1289 ~~modification or re-enactment thereof save to the extent~~
1290 ~~necessary to give effect to the provisions of this Clause.~~
1291 ~~The arbitration shall be conducted in accordance with~~
1292 ~~the London Maritime Arbitrators Association (LMAA)~~
1293 ~~Terms current at the time when the arbitration~~
1294 ~~proceedings are commenced.~~
1295 ~~The reference shall be to three arbitrators. A party~~
1296 ~~wishing to refer a dispute to arbitration shall appoint its~~
1297 ~~arbitrator and send notice of such appointment in writing~~
1298 ~~to the other party requiring the other party to appoint its~~
1299 ~~own arbitrator within 14 calendar days of that notice~~
1300 ~~and stating that it will appoint its arbitrator as sole~~
1301 ~~arbitrator unless the other party appoints its own~~
1302 ~~arbitrator and gives notice that it has done so within the~~
1303 ~~14 days specified. If the other party does not appoint its~~
1304 ~~own arbitrator and give notice that it has done so within~~
1305 ~~the 14 days specified, the party referring a dispute to~~
1306 ~~arbitration may, without the requirement of any further~~
1307 ~~prior notice to the other party, appoint its arbitrator as~~
1308 ~~sole arbitrator and shall advise the other party~~
1309 ~~accordingly. The award of a sole arbitrator shall be~~
1310 ~~binding on both parties as if he had been appointed by~~
1311 ~~agreement.~~
1312 ~~Nothing herein shall prevent the parties agreeing in~~
1313 ~~writing to vary these provisions to provide for the~~
1314 ~~appointment of a sole arbitrator.~~
1315 ~~In cases where neither the claim nor any counterclaim~~
1316 ~~exceeds the sum of US$50,000 (or such other sum as~~
1317 ~~the parties may agree) the arbitration shall be conducted~~
1318 ~~in accordance with the LMAA Small Claims Procedure~~
1319 ~~current at the time when the arbitration proceedings~~
1320 ~~are commenced.~~

1321 ~~* (b) This Charter Party shall be governed by and~~
1322 ~~construed in accordance with Title 9 of the United States~~
1323 ~~Code and the Maritime Law of the United States and~~
1324 ~~any dispute arising out of or in connection with this~~
1325 ~~Charter Party shall be referred to three persons at New~~
1326 ~~York, one to be appointed by each of the parties hereto,~~
1327 ~~and the third by the two so chosen; their decision or~~
1328 ~~that of any two of them shall be final, and for the~~
1329 ~~purposes of enforcing any award, judgement may be~~

Copyright © 2005 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this BIMCO SmartCon document will constitute an infringement of BIMCO's copyright. First published 1975. Revised 1989 and 2005. Adopted by the International Support Vessel Owners' Association (ISOA), London.
Explanatory notes are available from BIMCO at www.bimco.org.

## PART II
### SUPPLYTIME 2005 Time Charter Party for Offshore Service Vessels

1330 ~~entered on an award by any court of competent~~
1331 ~~jurisdiction. The proceedings shall be conducted in~~
1332 ~~accordance with the rules of the Society of Maritime~~
1333 ~~Arbitrators, Inc.~~
1334 ~~In cases where neither the claim nor any counterclaim~~
1335 ~~exceeds the sum of US$50,000 (or such other sum as~~
1336 ~~the parties may agree) the arbitration shall be conducted~~
1337 ~~in accordance with the Shortened Arbitration Procedure~~
1338 ~~of the Society of Maritime Arbitrators, Inc. current at~~
1339 ~~the time when the arbitration proceedings are~~
1340 ~~commenced.~~

1341 * **(c)** This Charter Party shall be governed by and
1342 construed in accordance with the laws of the <ins>United States of America</ins> ~~place~~
1343 ~~mutually agreed by the parties~~ and any dispute arising
1344 out of or in connection with this Charter Party shall be
1345 referred to arbitration at <ins>Houston, Texas, USA</ins> ~~a mutually agreed place~~, subject
1346 to the procedures applicable there.
1347 **(d)** Notwithstanding (a), (b) or (c) above, the parties
1348 may agree at any time to refer to mediation any
1349 difference and/or dispute arising out of or in connection
1350 with this Charter Party.
1351 In the case of a dispute in respect of which arbitration
1352 has been commenced under (a), (b) or (c) above, the
1353 following shall apply:
1354 (i) Either party may at any time and from time to
1355 time elect to refer the dispute or part of the dispute
1356 to mediation by service on the other party of a
1357 written notice (the "Mediation Notice") calling on
1358 the other party to agree to mediation.
1359 (ii) The other party shall thereupon within 14 calendar
1360 days of receipt of the Mediation Notice confirm that
1361 they agree to mediation, in which case the parties
1362 shall thereafter agree a mediator within a further
1363 14 calendar days, failing which on the application
1364 of either party a mediator will be appointed
1365 promptly by the Arbitration Tribunal ("the Tribunal")
1366 or such person as the Tribunal may designate for
1367 that purpose. The mediation shall be conducted
1368 in such place and in accordance with such
1369 procedure and on such terms as the parties may
1370 agree or, in the event of disagreement, as may be
1371 set by the mediator.
1372 (iii) If the other party does not agree to mediate, that
1373 fact may be brought to the attention of the Tribunal
1374 and may be taken into account by the Tribunal
1375 when allocating the costs of the arbitration as
1376 between the parties.
1377 (iv) The mediation shall not affect the right of either
1378 party to seek such relief or take such steps as it
1379 considers necessary to protect its interest.
1380 (v) Either party may advise the Tribunal that they
1381 have agreed to mediation. The arbitration
1382 procedure shall continue during the conduct of
1383 the mediation but the Tribunal may take the
1384 mediation timetable into account when setting the
1385 timetable for steps in the arbitration.
1386 (vi) Unless otherwise agreed or specified in the
1387 mediation terms, each party shall bear its own
1388 costs incurred in the mediation and the parties

1389 shall share equally the mediator's costs and
1390 expenses.
1391 (vii) The mediation process shall be without prejudice
1392 and confidential and no information or documents
1393 disclosed during it shall be revealed to the Tribunal
1394 except to the extent that they are disclosable under
1395 the law and procedure governing the arbitration.
1396 *(Note: The parties should be aware that the mediation*
1397 *process may not necessarily interrupt time limits.)*
1398 If Box 34 in PART I is not appropriately filled in, sub-
1399 clause 34(a) of this Clause shall apply. Sub-clause (d)
1400 shall apply in all cases.
1401 * Sub-clauses 34(a), 34(b) and 34(c) *are alternatives;*
1402 *indicate alternative agreed in* Box 34.

1403 **35. Notices**
1404 **(a)** All notices given by either party or their agents to
1405 the other party or their agents in accordance with the
1406 provisions of this Charter Party shall be in writing.
1407 **(b)** For the purposes of this Charter Party, "in writing"
1408 shall mean any method of legible communication. A
1409 notice may be given by any effective means including,
1410 but not limited to, cable, telex, fax, e-mail, registered or
1411 recorded mail, or by personal service.

1412 **36. Headings**
1413 The headings of this Charter Party are for identification
1414 only and shall not be deemed to be part hereof or be
1415 taken into consideration in the interpretation or
1416 construction of this Charter Party.

1417 **37. Severance**
1418 If by reason of any enactment or judgement any
1419 provision of this Charter Party shall be deemed or held
1420 to be illegal, void or unenforceable in whole or in part,
1421 all other provisions of this Charter Party shall be
1422 unaffected thereby and shall remain in full force and
1423 effect.

1424 **38. Entire Agreement**
1425 This Charter Party, including all Annexes referenced
1426 herein and attached hereto, is the entire agreement of
1427 the parties, which supersedes all previous written or
1428 oral understandings and which may not be modified
1429 except by a written amendment signed by both parties

<ins>**39. Tow Worthiness**</ins>

<ins>(a) The Charterer shall exercise due diligence to ensure that the Tow shall, at the commencement of the towage, be in all respects fit to be towed from the place of departure to the place of destination.</ins>

<ins>(b) The Charterer undertakes that the Tow will be suitably trimmed and prepared and ready to be towed at the time when the Vessel arrives at the place of Departure and fitted and equipped with proper chain Towing Bridles and andan Emergency Tow Wire. Owner to supply such shapes, signals, navigation and other lights of a type required for the towage.</ins>

<ins>(c) The Charterer shall supply the Owner or the Master, on arrival of the Vessel at the Place of Departure the most recent Survey issued by a recognized firm, provided always the Owner shall not be under any obligation to perform the towage until in his</ins>

Copyright © 2005 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this BIMCO SmartCon document will constitute an infringement of BIMCO's copyright. First published 1975. Revised 1989 and 2005. Adopted by the International Support Vessel Owners' Association (ISOA), London.
Explanatory notes are available from BIMCO at www.bimco.org.

PART II
SUPPLYTIME 2005 Time Charter Party for Offshore Service Vessels

discretion he is satisfied that the Tow is in all respects trimmed, prepared, fit and ready for towage but the Owner shall not unreasonably withold his approval.

Copyright © 2005 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this BIMCO SmartCon document will constitute an infringement of BIMCO's copyright. First published 1975. Revised 1989 and 2005. Adopted by the International Support Vessel Owners' Association (ISOA), London.
Explanatory notes are available from BIMCO at www.bimco.org.

ANNEX "A" to Time Charter Party for Offshore Service Vessels
Code Name: SUPPLYTIME 2005
Vessel Specification Sheet Provided Separately Shall Represent Annex A

VESSEL SPECIFICATION

1. General
   (a) Owner: Name:
              Address:
   (b) Operator: Name:
                 Address:
   (c) Vessel's Name:          Builder:
   (d) Year built:
   (e) Type:
   (f) Classification and Society:
   (g) Flag:
   (h) Date of next scheduled drydocking:
2. Performance
   (a) Certified Bollard Pull (Tonnes):
   (b) Speed/Consumption (Non-Towing)
   (Approx. Daily Fuel Consumption) (Fair eather)
   Max Speed:          Kts (app.)          Tonnes
   Service Speed:      Kts (app.)          Tonnes
   Standby (main engines secured):         Tonnes
   (c) Approx. Towing/Working Fuel Consumption
   Engine Power 100%                       Tonnes
   (d) Type(s) and Grade(s) of Fuel Used:
3. Dimensions and Capacities/Discharge Rates
   (a) L.O.A. (m):     Breadth (m):     Depth (m):
   Max Draught (m):
   (b) Deadweight (metric tons):
                                    Discharge Rate
   (c) * Cargo Fuel max ($m^3$):         /hr at        head
   (d) * Drill Water max ($m^3$):        /hr at        head
   (e) Potable Water ($m^3$):            /hr at        head
   (f) Dry Bulk ($m^3$):     in Tanks    /hr at        head
   (g) Liquid Mud ($m^3$):               /hr at        head
   (max. SG)
   State type of recirculation system i.e.mechanical agitation,
   centrifugal pumps etc.
   (h) Cargo Deck Area ($m^2$):    Capacity (m.t.):
   Length (m) x Breadth (m):
   Load Bearing Capacity
   (i) Heavy Weight Brine ($m^3$):
   (max. SG)                             /hr at        head
   * Multipurpose Tanks yes/no:
4. Machinery
   (a) BHP Main Engines:
   (b) Engine Builder:
   (c) Number of Engines and Type:
   (d) Generators:
   (e) Stabilisers:
   (f) Bow Thruster(s):
   (g) Stern Thruster(s):
   (h) Propellers/Rudders:
   (i) Number and Pressure Rating of Bulk Compressors:
   (j) Fuel Oil Metering System:
5. Towing and Anchor Handling Equipment
   (a) (i) Stern Roller (Dimensions):
       (ii) Anchor Handling/Towing Winch:         /
       (iii) Rig Chail Locker Capacity (linear feet of 3 in. Chain):
       (iv) Tugger Winches:
       (v) Chain Stopper Make and Type:
   (b) (i) Towing Wire:
       (ii) Spare Towing Wire:
       (iii) Work Wire:
       (iv) Spare Work Wire:
       (v) Other Anchor Handling Equipment (e.g. Pelican Hooks,
       Shackles, Stretchers etc.):
6. Radio and Navigation Equipment
   (a) Radios
       Single Side Band:
       VHF:
       Satcom:
   (b) Electronic Navigation Equipment:
   (c) Gyro:
   (d) Radar:
   (e) Autopilot:
   (f) Depth Sounder:
7. Fire Fighting Equipment
   (a) Class (FF1, FF2, FF3, other):
   (b) Fixed:
   (c) Portable:
8. Accommodation
   (a) Crew:              (b) Passengers:
9. Galley
   (a) Freezer Space ($m^3$):
   (b) Cooler ($m^3$):
10. Additional Equipment
    (a) Mooring Equipment:
    (b) Joystick:
    (c) Other:
11. Standby/Survivor Certificate          Yes/No
    Nos:

Copyright © 2005 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this BIMCO SmartCon document will constitute an infringement of BIMCO's copyright. First published 1975. Revised 1989 and 2005. Adopted by the International Support Vessel Owners' Association (ISOA), London.
Explanatory notes are available from BIMCO at www.bimco.org.

## ANNEX "B" to Time Charter Party for Offshore Service Vessels

Code Name: SUPPLYTIME 2005

INSURANCE

Insurance policies (as applicable) to be procured and maintained by the Owners under Clause 17:

(1)  Marine Hull Insurance. Hull and Machinery Insurance shall be provided with limits equal to those normally carried by the Owners for the Vessel.

(2)  Protection and Indemnity (P&I) or Marine Liability Insurance.

Protection and Indemnity (P&I) or Marine Liability Insurance with coverage equivalent to the cover provided by members of the International Group of Protection and Indemnity Associations with a limit of cover no less than USD          for any one event. The cover shall include liability for collision and damage to fixed and floating objects to the extent not covered by the insurance in (1) above.

(3)  General Third Party Liability Insurance. To the extent not covered by the insurance in (2) above, Coverage shall be for:

Bodily Injury       per person

Property Damage       per occurrence.

(4)  Workmen's Compensation and Employer's liability Insurance for Employees.

To the extent not covered in the insurance in (2) above, covering Owners' employees and other persons for whom Owners are liable as employer pursuant to applicable law for statutory benefits as set out and required by local law in area of operation or area in which the Owners may become legally obliged to pay benefits.

(5)  Comprehensive General Automobile Liability Insurance. Covering all owned, hired and non-owned vehicles, coverage shall be for:

Bodily Injury       According to the local law.

Property Damage       In an amount equivalent to       single limit per occurrence.

(6)  Such other insurances as may be agreed.

Copyright © 2005 BIMCO. All rights reserved. Any unauthorised copying, duplication, reproduction or distribution of this BIMCO SmartCon document will constitute an infringement of BIMCO's copyright. First published 1975. Revised 1989 and 2005. Adopted by the International Support Vessel Owners' Association (ISOA), London. Explanatory notes are available from BIMCO at www.bimco.org.